1

1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF ARKANSAS
2                            WESTERN DIVISION

3

4    UNITED STATES OF AMERICA,      .
                                    . Docket No. 4:17-CR-00172-01-JLH
5    PLAINTIFF,                     .
                                    .
6    VS.                            . Little Rock, Arkansas
                                    . July 24, 2017
7    RICKY L. HAMPTON,              . 2:24 p.m.
                                    .
8    DEFENDANT.                     .
     . . . . . . . . . . . . . . .

9

10

11                           TRANSCRIPT OF

12                           BOND HEARING

13            BEFORE THE HONORABLE JEROME T. KEARNEY

14                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18   ELECTRONIC COURT RECORDER-OPERATOR:  Ms. LaShawn Coleman

19

20   Transcription Service:              Robin Warbritton
                                         Post Office Box 262
21                                       Vilonia, AR  72173

22

23

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
 1   APPEARANCES:

 2   For the Government:      Ms. Stephanie Gosnell Mazzanti
                              Mr. Chris Givens
 3                           U.S. Attorney's Office
                             Eastern District of Arkansas
 4                           Post Office Box 1229
                             Little Rock, AR  72203-1229
 5
     For the Defendant:      Ms. Nicole Lybrand
 6                           Federal Public Defenders Office
                             The Victory Building
 7                           1401 West Capitol Avenue
                             Suite 490
 8                           Little Rock, AR  72201

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                    DIRECT    CROSS    REDIRECT    RECROSS

3  WITNESS FOR GOVERNMENT:

4  Warren Newman              8        41

5

6  WITNESS FOR DEFENDANT:

7  Audrey Webb               56        59        65          65

8

9  EXHIBITS:                       IDENTIFIED     RECEIVED

10 Government's Exhibit No. 10          9            12

11 Government's Exhibit No. 11          9            12

12 Government's Exhibit No. 1          10            12

13 Government's Exhibit No. 2          11            12

14 Government's Exhibit No. 3          14            17

15 Government's Exhibit No. 4          17            17

16 Government's Exhibit No. 5          22            22

17 Government's Exhibit No. 13         33            33

18 Government's Exhibit No. 6          34            34

19 Government's Exhibit No. 7          35            35

20 Government's Exhibit No. 8          36            37

21 Government's Exhibit No. 9          37            38

22 Government's Exhibit No. 15         38            38

23 Government's Exhibit No. 12         38            40

24 Government's Exhibit No. 12a        39            40

25

4

<u>P R O C E E D I N G S</u>

1

2      (Call to order of the Court.)

3            THE COURT:  Good afternoon.

4            MS. MAZZANTI:  Good afternoon, Your Honor.

5            MS. LYBRAND:  Good afternoon, Your Honor.

6            THE COURT:  Have a seat, please.

7            All right.  We're here this afternoon for a bond

8      hearing in the case of *United States of America versus Ricky*

9      *L. Hampton*.  This is case number 4:17-CR-00172.

10           I'm going to read into the record the case history as

11     I know it.

12           A criminal complaint and arrest warrant was issued by

13     the Court on July 3rd of this year.  Mr. Hampton was indicted

14     on July 6th and a writ was issued for him to appear for his

15     initial appearance and plea and arraignment held before the

16     Court on July 18.

17           He was charged in that indictment with being a felon

18     in possession of a firearm in violation of 18 U.S.C. §

19     922(g)(1).

20           The Court also reviewed his financial affidavit in an

21     effort to determine whether or not he should receive court

22     appointed counsel and made a preliminary determination to go

23     forward with appointed counsel, however, expressing that --

24     that it did not appear, based upon the representations in his

25     affidavit, that he qualified for the appointment of counsel.

1  An investigation is continuing in that regard.  I'm going to

2  allow him to proceed with counsel today.  Mr. Hampton and Ms.

3  Lybrand, the Probation Office will be getting with him, and

4  he's expected to cooperate, to make a determination as to

5  whether or not he should continue to have appointed counsel.

6       MS. LYBRAND:  Yes, Your Honor.  And he'll have the

7  right to counsel during the interview, correct?

8       THE COURT:  That's fine.  Yes.

9       MS. LYBRAND:  Thank you, Your Honor.

10      THE COURT:  All right.  I next show that an order to

11 lodge detainer was entered by the Court, as the defendant was

12 in state custody.  Then the defense counsel filed a motion for

13 a bond hearing, which was filed on July 20th, stating that on

14 July 19th that St. Francis County had set a bond of 200,000

15 dollars in the defendant's -- on the defendant's pending state

16 charges and he was anticipated to be bonded out within the

17 next couple of days.  I have now been given word that he has

18 bonded out.  And we're here today for this bond hearing.

19      And are the parties ready to proceed?

20      MS. MAZZANTI:  Yes, Your Honor.

21      MS. LYBRAND:  Yes, Your Honor.

22      THE COURT:  All right.  The Court recognizes Ms.

23 Nicole Lybrand here on behalf of Mr. Hampton, and Mr. Chris

24 Givens and Stephanie Mazzanti here on behalf of the

25 Government.

1      All right.  I'm going to go ahead and ask, Mr. Givens

2  or Ms. Mazzanti, what are the bases for your request for

3  detention?

4      MS. MAZZANTI:  Your Honor, based upon the failure to

5  appear, we believe Mr. Hampton is a risk of flight, as well as

6  assets believed to be available to him based upon his own

7  statements under oath.  And additionally, Your Honor, and

8  primarily, he's a danger to the community and should be

9  detained.

10      THE COURT:  Okay.  Let me ask you, Ms. Lybrand --

11  well, both sides actually, I have received a Pretrial Report

12  -- a Pretrial Report, and have you all, both sides, had an

13  opportunity to review that report?

14      MS. LYBRAND:  I have, but I have not reviewed it with

15  my client, Your Honor.

16      THE COURT:  Okay.  I'm going to give you a couple of

17  minutes to do that now, because I have it and I'm going to

18  rely on it, and so if there's anything that's incorrect in it,

19  he needs to tell me.

20      MS. LYBRAND:  Okay.

21     (Ms. Lybrand reviews Pretrial Services Report with the

22  Defendant, off the record.)

23      MS. LYBRAND:  We do have a few issues.

24      THE COURT:  Okay.

25      MS. LYBRAND:  On page two, it states the employment

1  start date is 7/24 of '17.

2          THE COURT:  Okay.

3          MS. LYBRAND:  And that should actually be March of

4  2017.

5          THE COURT:  March of 2017.

6          MS. LYBRAND:  I don't have a specific date, but

7  sometime during that time period.

8          THE COURT:  Okay.

9          MS. LYBRAND:  He no longer has any assets on hand.

10  The 2,000 which he had on his books was applied towards his

11  bond in state court.  And as stated before, the 40,000 dollar

12  a month was -- is projected income if he were to be released.

13          THE COURT:  You're saying the -- the salary that he

14  reported was intended to be if released?

15          MS. LYBRAND:  Yes, Your Honor.  He wasn't making

16  40,000 dollars a month when he was out, but he had a

17  significant number of shows booked for this month that he

18  anticipated would bring him close to 40,000 dollars.

19          THE COURT:  Okay.

20          MS. LYBRAND:  But most of those have been canceled.

21          THE COURT:  All right.  And as I said, we'll be

22  looking in to all of that.  Okay.

23          Mr. Givens or Ms. Mazzanti, you may call your first

24  witness.

25          MS. MAZZANTI:  Your Honor, we call Special Agent

1   Warren Newman with the ATF.

2       WARREN NEWMAN, GOVERNMENT'S WITNESS, SWORN.

3                           DIRECT EXAMINATION

4   BY MS. MAZZANTI:

5   Q    Will you please state your name?

6   A    Warren Newman.

7   Q    How are you employed?

8   A    I'm a special agent with the Bureau of Alcohol, Tobacco,

9   and Firearms, assigned to the Little Rock field office.

10  Q    How long have you been with ATF?

11  A    Since 1999.

12  Q    And what did you do before you were with ATF?

13  A    I was a local police officer in Biloxi, Mississippi.

14  Q    And are you assigned to work on the investigation

15  regarding Ricky Hampton?

16  A    Yes, ma'am.

17  Q    And with respect to Mr. Hampton's income that we were just

18  discussing, a couple of things we wanted to bring to the

19  Court's consideration, if we could show Government's Exhibit

20  10.  Are there a number of social media posts that you have

21  viewed online that relate to Mr. Hampton?

22  A    Yes.  Several.

23  Q    Okay.  And with respect to Government's Exhibit 10 that we

24  see here, how much does Mr. Hampton represent on his social

25  media page that he makes per show?

1  A    Six to seventy -- seventy-five hundred dollars a show.

2       (Government's Exhibit No. 10 identified.)

3  BY MS. MAZZANTI:

4  Q    So 6,000 to 7,500 dollars per show?

5  A    Yes.

6  Q    And looking at other social media posts, since May 14th

7  how many shows have you seen advertisements for that were

8  posted on social media in which Mr. Hampton would participate,

9  at a minimum?

10 A    I believe the -- since the May date, he's done 13 shows.

11 The last would be the Birmingham show that we arrested him at.

12 Q    If we could also show Government's Exhibit 11, is this

13 also a post on Ricky Hampton's Facebook page?

14 A    Yes.

15 Q    And what do you see in this photograph?

16 A    Several large -- or a couple of large stacks of 100 dollar

17 bills.

18      (Government's Exhibit No. 11 identified.)

19 BY MS. MAZZANTI:

20 Q    Okay.  And on here, is there reference to a hundred

21 thousand dollar bond?

22 A    Yes, I believe he made it for his brother, if I'm not

23 mistaken.   It was a hundred thousand dollar bond here

24 recently.

25 Q    Okay.  And this was April 26th of this year?

1  A   Yes.

2  Q   Okay.  Let's go to the instant offense.  Can you tell the

3  Court about your investigation as it relates to the felon in

4  possession of a firearm charge against Mr. Hampton in the --

5  involving the Forrest City possession?

6  A   We've got a -- Mr. Hampton is charged with possessing an

7  RAS-47, which is an AK-style pistol, at the -- at -- in

8  Forrest City, among other places.  We have videos of him with

9  it in Marianna also.  It was also recovered in Birmingham when

10 we arrested him.  He allegedly used this gun and shot at a

11 female who was attempting to back up away from him.  She had

12 blocked him in as him and his entourage were attempting to

13 leave a show, and Mr. Hampton became very irate and drew the

14 weapon.

15 Q   Okay.  And during the course of the investigation, did you

16 recover two Facebook videos -- or videos that were Facebook

17 posts that relate to the Forrest City shooting of -- involving

18 the female victim?

19 A   Yes, I did.

20          MS. MAZZANTI:  Okay.  If we could play Government's

21 Exhibit 1, please.

22      (Government's Exhibit No. 1 identified.)

23      (Begin playback of video, Government's Exhibit 1.)

24          MS. MAZZANTI:  All right.  If you'll pause it there,

25 please.

1        (Pause playback of video, Government's Exhibit 1.)

2    BY MS. MAZZANTI:

3    Q    And the -- the person here on the video in the -- what

4    appears to be a blue shirt, what does it appear that he's

5    holding?

6    A    He's holding the RAS AK -- the RAS-47 AK-style pistol that

7    we recovered in Birmingham.

8    Q    And does the individual depicted here appear to be Mr.

9    Hampton?

10   A    Yes.  In fact, he's called by name several times.

11       (Resume playback of video, Government's Exhibit No. 1.)

12       (End playback of video, Government's Exhibit No. 1.)

13   BY MS. MAZZANTI:

14   Q    Okay.  Was a second video also recovered with respect to

15   the Forrest City incident?

16   A    Yes, there was.

17           MS. MAZZANTI:  If we could play Exhibit 2, please.

18       (Government's Exhibit No. 2 identified.)

19       (Begin playback of video, Government's Exhibit No. 2.)

20       (End playback of video, Government's Exhibit No. 2.)

21   BY MS. MAZZANTI:

22   Q    And these two videos relate to the Forrest City shooting

23   that occurred on or about the late night hours of June 24th or

24   early morning hours of June 25th; is that right?

25   A    Yes.

1  Q   Okay.

2        MS. MAZZANTI:  Your Honor, at this time I'd move to

3  admit Government's Exhibits 10, 11, 1 and 2.

4        THE COURT:  Any objection?

5        MS. LYBRAND:  No, Your Honor.

6        THE COURT:  All right.  They'll be received.

7     (Government's Exhibits No. 10, 11, 1, and 2 received.)

8  BY MS. MAZZANTI:

9  Q   And the victim of the Forrest City shooting gave a

10 statement with respect to this investigation; is that correct?

11 A   She gave one to Forrest City P.D. and she was also

12 interviewed by me.

13 Q   Okay.  And were the victim's statements supported by the

14 observations in this video?

15 A   Yes.

16 Q   And did the victim indicate that she had, in fact, been

17 struck by --

18 A   She --

19 Q   -- a bullet or something?

20 A   She self-reported to Forrest City hospital and she was

21 treated for a gunshot graze to the neck.

22 Q   Okay.  And what was the victim's statement with respect to

23 what occurred on that evening?

24 A   She advised me that she was attempting to pull into the

25 club.  She said she pulled in, and as they were leaving she

1  had blocked them in, so they started screaming at her.  She

2  got real upset and nervous trying to back up.  She can be

3  heard on the video telling them, "I can't drive.  I'm trying."

4  Some time during the video, she says that she got her vehicle

5  turned around and tried to get out of there.  She saw Ricky

6  Hampton with the gun pointed at her.  She said as soon as she

7  turned, he fired, and a gunshot went through the rear window

8  of her vehicle.

9  Q   Okay.  Will you go to Government's Exhibit 3, please?  Was

10 there also a video posted that appears to be from Marianna,

11 Arkansas?

12 A   This is a video from a place called Sam's Corner.  It's at

13 the corner of Alabama and California Streets in Marianna.

14 From intelligence from us and local police officers, this is a

15 known gang thug hangout.

16        MS. LYBRAND:  Objection, Your Honor.  There's no

17 basis for that statement.  We move to strike.

18        THE COURT:  I'll sustain it as to the thug hangout.

19 That's a characterization.

20        THE WITNESS:  Yeah.

21        THE COURT:  Go ahead.  I'll sustain the objection in

22 that regard.

23        MS. MAZZANTI:  Okay.

24 BY MS. MAZZANTI:

25 Q   And what date was this video posted?

1  A    This was posted June 27th of 2017.

2       (Government's Exhibit No. 3 identified.)

3          MS. MAZZANTI:  Okay.  And if we could just go ahead

4  and play that video.  Thank you.

5       (Begin playback of video, Government's Exhibit No. 3.)

6       (End playback of video, Government's Exhibit No. 3.)

7  BY MS. MAZZANTI:

8  Q    Okay.  Can you describe what was posted in that video?

9  A    It's a picture of Mr. Hampton in the passenger's side of

10 that E500 silver Mercedes that he was arrested in, the same

11 vehicle that you saw in the Forrest City video.  The driver of

12 this vehicle is Kentrell Gwynn, which is his hired bodyguard.

13 And Mr. Hampton is seen sitting there with that RAS-47 pistol.

14         MS. LYBRAND:  Your Honor, I'm going to object to him

15 describing the entire video since the Court has just viewed it

16 and ask the Court to make its own conclusions.

17         THE COURT:  I'm going to allow him to go ahead with

18 the description.  Is this based upon -- when you give that

19 description, is this based upon your investigation?

20         THE WITNESS:  This is based upon my investigation, my

21 observations, and interviews of witnesses.

22         THE COURT:  I'm going to allow it.  Go forward.  Go

23 ahead.

24 BY MS. MAZZANTI:

25 Q    Okay.  And it appears that -- that Mr. Hampton is in

1  possession of -- you were describing the firearm?

2  A    The RAS-47 pistol that was purchased by Kentrell Gwynn.

3  Q    And that was purchased by Mr. Gwynn on what date?

4  A    I don't have that affidavit in front of me.  It was on a

5  trace that I put in the affidavit.  Do you have that date?

6  Q    Just a second.

7  A    May 26th, I believe.

8  Q    That's correct.  Okay.

9  A    Does that sound right?

10  Q    All right.  So with respect to the gun, Mr. Gwynn

11  purchased that firearm on or about May 26th, 2017, the gun

12  that Mr. Hampton is charged with possessing in this case?

13  A    Yes.

14  Q    All right.  And there are references in the video to

15  Moneybagg.  Did that become relevant to your investigation as

16  it relates to detention?

17  A    Yes, it does.

18  Q    Okay.

19  A    Mr. Hampton goes by the rapper name of Finesse2Tymes.  He

20  has an -- or had an ongoing feud with Moneybagg Yo, which is

21  another rapper in Memphis.  There were several incidences

22  where those groups exchanged gunfire at different events.

23          MS. LYBRAND:  Your Honor, objection.

24          THE COURT:  What's the basis?

25          MS. LYBRAND:  That there is no evidence, he's just

1   testifying as to his -- I mean, they're not -- he's not saying

2   where he got this information that there were several

3   incidences of gunfire.

4             THE COURT:  She asked him if -- if it became relevant

5   based upon his investigation.  I overrule the objection.

6             MS. MAZZANTI:  Your Honor, we'll just -- we'll go in

7   to that in just little bit more detail.

8             THE COURT:  Uh-huh.

9   BY MS. MAZZANTI:

10  Q   With respect to Government's Exhibit 4, did you also view

11  a Facebook post that was relevant to Mr. Hampton's possession

12  of the firearm charged in the indictment?

13  A   Yes.  There's a picture of Mr. Hampton with smoke coming

14  out of his mouth.  On his shoulder, that's the RAS-47.  It has

15  all the characteristics of the gun bought by Mr. Kentrell

16  Gwynn that he has on his shoulder.  It's the same rifle that

17  you see in the Marianna video.  Same rifle that you see in the

18  Forrest City video.  And it says "Got the" -- his spelling is

19  a little off, but "Got the drake by the doe."  And I'm

20  assuming that the "doe" is a door.  But the drake is reference

21  to a Draco pistol, which was the first AK-47 pistol that was

22  imported and assembled in -- from Romania into the United

23  States.  So it became a -- a household term, for lack of a

24  better word.  Like your tissue is not always Kleenex, but you

25  call it -- you refer to it as Kleenex.  Your copy machine is

1   not always a Xerox, or your Draco is not always a Romanian

2   Draco AK-47 pistol.  The one that Mr. Hampton's possessing is

3   an RAS-47 produced by Century Arms in the United States, but

4   amongst the firearms community it's referred to as a Draco

5   because it's a AK-47 pistol.

6   Q   And this Facebook post on Mr. Hampton's page is dated June

7   21st; is that right?

8           THE WITNESS:  Can I stand up, Your Honor?

9           THE COURT:  Yes.

10          THE WITNESS:  Yes.

11      (Government's Exhibit No. 4 identified.)

12          MS. MAZZANTI:  Your Honor, at this time, I move to

13   admit Government's Exhibits 3 and 4.

14          THE COURT:  Any objection?

15          MS. LYBRAND:  No, Your Honor.

16          THE COURT:  All right.  Be received.

17      (Government's Exhibits No. 3 and 4 received.)

18   BY MS. MAZZANTI:

19   Q   Okay.  Can you tell the Court about the seizure of the

20   firearm that's charged in this case?

21   A   We had a criminal complaint for Mr. Hampton.  And we knew

22   he was going to Birmingham on the night of July 2nd, I believe

23   it was.  And ATF, FBI, United States Marshals Service,

24   conducted surveillance of the place.  Mr. Hampton and Mr.

25   Gwynn pull into the location that he's going to do his show at

1   in the E500 silver Mercedes.  The arrest team goes in to

2   arrest him.  Mr. Hampton is in the -- the passenger's seat of

3   the Mercedes, like he is every time you see a video or a

4   picture.  Kentrell Gwynn is driving, his hired bodyguard.  He

5   goes by the street name of Dirt.  And Mr. Gwynn is dressed in

6   bodyguard apparel.  He's got like the BDU pants, like police

7   wear.  He's got a badge hanging around his neck.  He's got

8   body armor on.  He's got a thigh holster with a Springfield

9   XD-40, .40 caliber pistol in it.

10      When the police approach, there's a gun laying in his lap,

11  he has his hands up, and it's a Glock-23, .40 caliber pistol

12  that was purchased by Mr. Gwynn and Mr. Hampton at about one

13  o'clock after the shooting here in Little Rock.  It was bought

14  in Memphis before they went to Birmingham.

15      Behind the driver's seat is a AK-47, AR -- RAS-47,

16  AK-47-style pistol that you see in the video that we -- that

17  we recovered.  And it was purchased by Mr. Gwynn.

18  Q   Were there any papers regarding the recently purchased .40

19  caliber pistol?

20  A   The Glock-23 pistol that I advised you was purchased

21  earlier that day, the -- the receipt for it was stuffed down

22  in the passenger's side door, where Mr. Hampton was sitting,

23  and also a magazine for that weapon was in the passenger's

24  side door.  The gun, when the police walked up to the car,

25  was, like I said, laying in Mr. Gwynn's lap, who is his

1  bodyguard and driver.

2  Q   And was Mr. Hampton interviewed with respect to the

3  firearm at issue in this case?

4  A   ATF-Birmingham interviewed him.

5  Q   And did Mr. Hampton make any admissions with respect to

6  possession of the AK-style pistol that was recovered?

7  A   His exact words was, "I upped the Draco at Forrest City."

8  Meaning he pulled it up.  He goes, "But I did not fire it."

9  Q   Okay.

10 A   So he admitted possession of that Draco pistol that was

11 behind -- did I mention where the Draco -- where the RAS-47

12 was at?  Behind the driver's seat.

13 Q   Okay.  And behind the driver's seat, what does it appear

14 who would have the -- who would have ready access to that if

15 it's behind the driver's seat?

16 A   Mr. Hampton would have readily access to it.  Mr. Gwynn

17 couldn't get to it in the driver's seat, to that size weapon

18 behind a seat.  There were two other occupants of the vehicle.

19 By Mr. Hampton's own statement, he says to the ATF-Birmingham,

20 "Those gun" -- "That gun didn't belong to that guy."

21 Q   Okay.  To the rear passenger?

22 A   To the rear passenger, yeah.  There was a young black male

23 sitting in the rear passenger seat.  The gun was right there

24 in front of him.  Mr. Hampton says, "That's not his gun."  And

25 the young black male also says that, "Man, I got in the car to

1  ride from the motel to here, and that gun was there."

2  Q    Okay.

3  A    He goes, "It was there when I got in the car."

4  Q    And did Mr. Hampton also admit that he had just been

5  relatively recently released from prison during his interview

6  with ATF?

7  A    Yes, I believe he stated he had got out of prison

8  approximately ten months prior to this arrest.

9  Q    And did he also admit that he was moving around with

10 illegal firearms until some incident in Illinois?

11 A    Yes, he said he would run around with illegal firearms

12 until he evidently had an incident with the police in

13 Illinois.   I'm still trying to track that down.

14 Q    Okay.  Did he also make any statements with respect to his

15 gang affiliation?

16 A    He advised that he was a Vice Lord.  In fact, Mr. Hampton

17 has a large tattoo that says "Ghost Knob" on the back -- on

18 his back, that is a part of the Memphis Vice Lords.

19 Q    He was also interviewed by LRPD; is that right?

20 A    He was.

21 Q    And with respect to the firearms at issue here, did --

22 what did he state with respect to the Draco that he's charged

23 in the indictment with?

24 A    He told Little Rock investigators that he possessed it in

25 Forrest City.

Case 4:17-cr-00172-JLH   Document 40   Filed 08/11/17   Page 21 of 78

Newman - Direct                                          21

Q   And did he refer to "our Draco" and "we got an XD"
regarding that statement?

A   Yes.  That was his exact words during the interview, he
goes, "We didn't have our Draco" -- "our Draco at the club."
When he's referring to the Little Rock shooting.  He goes, "We
got the XD.  We got the XD and he got a .45."  Said he bought
the .45, but the .45 ain't in his name.

Q   Did he also make any statements with respect to an
incident involving -- involving him attempting to fire a
weapon at a club in the past?

A   I'm going to quote Mr. Hampton's comment to the Little
Rock P.D.  He said:

                    "Last time I tried to fire a
                    weapon, bro, this is what happened
                    at the club, my manager slapped it
                    out of my hand, they got on my
                    ass, they were like 'You can't be
                    seen with no fuckin' gun, bro.
                    You can't be seen.'  And ever
                    since then, that's what made me go
                    hire security.  I -- I can't sit
                    here and lie to you all like that.
                    I want to move around with guns on
                    my entourage at first."

Q   And did he also make any statements with respect to his

1  use of drugs?

2  A   He said:

3              "When I buy drugs, I buy them to

4              smoke.  I don't sell drugs."

5  Q   Okay.

6          MS. MAZZANTI:  If we could show Government's Exhibit

7  5, please.

8  BY MS. MAZZANTI:

9  Q   And can you describe what's depicted in Government's

10 Exhibit 5?

11         THE WITNESS:  Can I stand up, Your Honor?

12         THE COURT:  You may.

13         THE WITNESS:  All right.  This is the recovered

14 RAS-47, 7.62 by .39 caliber, AK-47-style pistol that we

15 recovered behind the driver's seat of that E500 Mercedes.

16         MS. MAZZANTI:  Okay.  Your Honor, at this time I

17 would move to admit Government's Exhibit 5.

18         MS. LYBRAND:  No objection.

19         THE COURT:  Be admitted.

20     (Government's Exhibit No. 5 identified and received.)

21         MS. MAZZANTI:  Okay.  And, Your Honor, just for

22 purposes of brevity, are the Pretrial Services Report under

23 consideration with Ms. Lybrand's comments noted?

24         THE COURT:  Yes.

25         MS. MAZZANTI:  Okay.

1  BY MS. MAZZANTI:

2  Q   All right.  And you're aware that Mr. Hampton has a couple

3  of convictions for aggravated robbery from 2010?

4  A   He has two convictions for aggravated robbery.

5  Q   Okay.  All right.  Can you tell the Court what

6  observations were made with respect to the defendant's

7  interactions with Mr. Gwynn when they appeared for court?

8  A   When we were coming for the first appearance, Mr. Gwynn

9  had went first.  I was late getting Mr. Hampton here.  The

10 Marshals were escorting Mr. Hampton through the hallway, and I

11 was coming up with Mr. Gwynn.  As we got close to each other,

12 Mr. Hampton got out of line and got up in his face and mumbled

13 something to him.  We immediately put him in the elevator --

14 put Mr. Gwynn in the elevator.  And as we were going up to the

15 Marshals Office he's visibly upset.  And I asked him what was

16 wrong and he said Mr. -- Mr. Hampton had put out a hit on him.

17 And that -- this information was confirmed through

18 intelligence from Memphis.

19         MS. LYBRAND:  Your Honor, I'm going to object to

20 that.  I have heard absolutely no information about this in

21 discovery.

22         THE COURT:  Yeah.

23         MS. LYBRAND:  And we have nothing that supports the

24 basis for a hit being put out.  That's an extremely big

25 allegation with no evidence to support it.

1          THE WITNESS:  Can I expound on something, Your Honor?

2          THE COURT:  Well, her -- her objection has to do with

3   this is surprise evidence, and reliability.  I'm going to --

4   I'm going to exclude that.  So let's -- let's move on.

5   BY MS. MAZZANTI:

6   Q   Okay.  Let's go over a little bit of Mr. Hampton's

7   interactions and -- with law enforcement.  If we could go back

8   on January 28th of '07.  Have you reviewed some police reports

9   with respect to Mr. Hampton in the sense in which he was a

10  named suspect?

11  A   Yes.  On 1/28 of '07, he was named as a suspect in a

12  threatening phone call.  He called up a female and he goes:

13                  "I'm gonna get you, ho.  You're

14                  gonna die.  Bring your retarded

15                  brother to school with ya, ho."

16      And she filed a complaint with Mr. Hampton as the suspect.

17  Q   All right.  And --

18          THE COURT:  I'm sorry?  Who was that?

19          THE WITNESS:  It was --

20  BY MS. MAZZANTI:

21  Q   A victim on 1/28 of '07?

22  A   Dominique Millbrooks.

23          THE COURT:  Okay.

24          MS. MAZZANTI:  And, Your Honor, we were just

25  attempting to avoid victim's names here.

1          THE COURT:  That's okay.  I understand.

2  BY MS. MAZZANTI:

3  Q    If we can go to 2/21/07.  Was there another incident

4  report where Mr. Hampton was --

5  A    2/21/07, he was a suspect in a residential burglary.

6  Three suspects were at her home.  She described that she went

7  to sleep.  When she woke up a bag -- black bag with property

8  listed was in her home.  And Mr. Hampton had this bag on his

9  -- on his person.  The property was stolen.  And it was

10  returned to the victim.

11  Q    Okay.  On 1/14 of '08, was there another incident that was

12  reported?

13  A    This is robbery of an individual.  The victim reported

14  that three black males approached him, said give me the money.

15  The victim advised one of the suspects pointed a shotgun at

16  him.  He started to run.  Heavyset suspect punched him in the

17  face and yelled bitch.  Made him give him his wallet.  Mr.

18  Hampton was one of the suspects.

19  Q    1/18 of '08, was there another individual robbery where

20  Mr. Hampton was a named suspect?

21  A    Another robbery of an individual, same area as the last

22  one, in the Memphis area.  Three black males attempted to rob

23  her.  She stated that subjects approached her, she had nothing

24  on her.  One of the subjects pulled out a shotgun.  The only

25  thing she had was two barrels in her face and couldn't provide

1  -- didn't provide them with anything.  Mr. Hampton is listed

2  as a suspect.

3  Q   Okay.  1/25/08?

4  A   The victim was stopped by five individuals.  Juveniles

5  kicked him while he sat on his bicycle.  All five suspects

6  began to kick him, hit him, took his Huffy mountain bike.  Mr.

7  Hampton supposedly threatened to shoot the individual.  That's

8  when the victim was struck several times with a shiny object.

9  He was covering his face when he was hit with it.

10      And then, that same day, right around the -- no, that's

11  1/28.  Is that a misprint?  Because I know there were two

12  robberies within minutes of each other with the same suspect

13  description, a shotgun, and in this one the suspect reached

14  into the victim's pocket and took his cell phone and wallet.

15  Q   I was just going to clarify, it just says the listed

16  defendant threatened to shoot the victim; is that right?

17  A   Yes.

18  Q   And then they later reference the listed defendant in the

19  next couple of sentences by another --

20  A   You're correct.

21  Q   -- so it was not Mr. Hampton that was listed in the report

22  as the actual person who threatened to shoot the victim?

23  A   You're correct.

24  Q   But he was a listed suspect in that case?

25  A   Uh-huh.

1  Q    Okay.  All right.  And the victim sustained injuries in

2  that case?

3  A    Ma'am?

4  Q    Did the victim sustain a broken arm and wrist in that

5  incident on 1/25 of '08?

6  A    Yes.

7  Q    All right.  If we can go to 1/28 of '08?

8  A    All right.  The victim was approached by two black males.

9  Suspects approached with a dark shotgun, demanded money.

10 Victim raised his hands, had no money.  They removed his cell

11 phone and wallet, told him to start walking, don't run.  And

12 then that's when the other robbery occurred within two minutes

13 at Snowden near Barksdale, which is right around the corner.

14 Suspects matched.  And it's the fourth or fifth robbery of

15 individuals in that -- in that two week period.

16 Q    And in that incident, that's actually one of the offenses

17 that Mr. Gwynn [sic] was convicted of --

18 A    Yes.

19 Q    -- aggravated robbery on?

20 A    That's one of the ones of his conviction.

21 Q    If we can go to one -- another incident on 1/28 of '08.

22 A    My next one is March 23rd of '09.

23 Q    March 23rd, '09.  Excuse me.

24 A    The victim advised that her residence was broken into

25 while she was away from home.  Entry was through a window.

1   Advised her Xbox was taken, memory cards, four games, valued

2   at about 1,000 dollars.  Prints were recovered at the scene.

3   The prints matched Mr. Hampton.  He was arrested.

4   Q   10/25 of '13, was there another incident report filed with

5   respect to Mr. Hampton?

6   A   Yeah.  This was a simple assault.  Ricky Hampton picked up

7   a beer bottle and hit a female [sic] in the head.  And then

8   both -- the other -- him and the other suspect that was with

9   him ran off.

10  Q   Just to clarify, the individual listed, if you'll look up

11  at the top, it reflects that there were two females running

12  from him, but a male -- can you check that, please --

13  A   Yeah.

14  Q   -- was actually hit in the head with a beer bottle?

15  A   He observed his sister and witness -- it's hard to read

16  this -- running up to him, both suspects walking up.  Suspect

17  said, "You keep your sistas away."  Mr. Hampton was obviously

18  known to these victims.  They started a fight.  And that's

19  when Mr. Hampton hit one of them in the head with a bottle.

20  Q   And if you'll look at the victim's name?

21  A   It is LaSanta [phonetic] Robinson.

22  Q   If you'll look at the top where it says --

23  A   And Alicia Robinson is the witness.  And Denesha Sanders

24  is a witness.

25  Q   And LaSanta Robinson is a black male?

1  A    Black male.   I'm sorry.

2  Q    Okay.   I just wanted to clarify that.   All right.   3/4 of

3  '14, was there another incident report filed where Mr. Hampton

4  was listed as a suspect?

5  A    Yeah.   It's a simple assault, domestic violence.   They --

6  police knocked on the door, had -- there was a fight going on.

7  Q    The complainant reported that she knocked on the door?

8  A    Yes.

9  Q    Ricky Hampton walks out the rear door and got into a gray

10 Suburban, I believe.   The victim didn't want to be

11 photographed, but police noted that she had red bruises on her

12 left arm and bicep, red mark under her left eye.   She

13 identified Ricky Hampton as the assault -- the person who

14 assaulted her.

15 Q    And did Mr. Hampton yell through the door, "I'm gonna get

16 my gun" during that incident?

17 A    That's when he left.   He walked out the door and he yelled

18 "I'm gonna get my gun."

19 Q    If we could go to 8/13 of 2014.   Was there another

20 incident involving the same victim from the March 4th, 2014

21 incident?

22 A    Yes.   She was involved with a verbal altercation with her

23 boyfriend, Ricky Hampton.   She walked outside.   He pushed her.

24 He then pulled out a handgun and fired a shot into the -- into

25 the air.   And she knew Mr. Hampton because they were boyfriend

1   and girlfriend.

2   Q   And in those instance, the victim was uncooperative?

3   A   Yes.

4   Q   If you'd go to 8/23/2014?

5   A   This is a robbery of a individual again.  He -- the victim

6   reported that he had just been robbed by several black males

7   driving a green vehicle.  They -- the victim showed the police

8   where they had -- where the suspects had ran.  They pulled

9   into the Arbor Apartments.  The suspects fled the green

10  vehicle, went upstairs on the second floor, and then as the --

11  as the suspects were running back down, the police made

12  contact with them, advised Mr. Hampton to put his hands in the

13  air, get on the ground.  Mr. Hampton refused, kept saying, "I

14  didn't do anything."  He refused to comply, had to be forcibly

15  put on the ground.  Took Mr. -- after the officer got Mr.

16  Hampton handcuffed, she took him to the vehicle.

17  Q   Ultimately, up on the second floor, where the suspects

18  came from, did they recover evidence in the case?

19  A   Yeah.  They recovered a handgun on the second floor under

20  a doormat and also the stolen property under a doormat.

21  Q   And on 8/23 of '14, did Mr. Hampton report that he has

22  been a Vice Lord since he was a kid and is still an active

23  member?

24  A   Yes, he did.

25  Q   If you'll go to 5/16 of '15?

1   A    This incident actually occurred while Mr. Hampton was

2   incarcerated for the robbery charges.  He made a phone call

3   from the jail and threatened to kill --

4            MS. LYBRAND:  Your Honor, I object to him saying he

5   made a phone call.  That's an allegation.  He was never

6   charged.

7   BY MS. MAZZANTI:

8   Q    What is Mr. Hampton alleged to have done?

9   A    Threaten a victim, saying he's going to kill her and her

10  family.

11           THE COURT:  Is this -- is this in a report that you

12  provided to --

13           MS. MAZZANTI:  It is, Your Honor.

14           THE COURT:  All right.

15           MS. MAZZANTI:  And, Your Honor, just for the record,

16  with respect to the other incident, we don't -- I don't

17  actually have that in a report form at this point, it was a

18  relatively recent incident.

19  BY MS. MAZZANTI:

20  Q    On -- if you can go on to 10/18 of '16?

21  A    This victim reported a burglary -- or a theft from a

22  building.  She advised that some time between 10/14 of '16 and

23  10/17 of '16, her .40 caliber handgun was stolen from her

24  residence.  She said the only person that was in the apartment

25  during that time was her ex-boyfriend, Ricky Hampton.  She

1  believes he took the gun, but she doesn't know that he did.

2  Q   She didn't actually see him take it; is that right?

3  A   That's correct.

4  Q   Okay.  With respect to other conduct that you have

5  discovered during the course of your investigation, on 8/23 of

6  '16, was there a social media video that was re-posted later

7  on by Mr. Hampton on his first day out of the penitentiary?

8  A   Yes, it described, "It's my first day out of the

9  penitentiary."  He says, "This is where it all happened."  And

10 he's -- he's rapping while he's talking about it.  And he has

11 a firearm on his side, as you can clearly see in the video.

12 Q   And on March 12th, 2017, was there incident at a Columbus,

13 Georgia show?

14 A   Yes.  Mr. Hampton was involved in a shooting at the

15 Columbus, Georgia show with Moneybagg Yo as the performer.

16 Q   Okay.  And the -- this information is -- is based upon

17 your investigation to date that there are allegations that he

18 was involved in that shooting; is that right?

19 A   Yes.  He's mentioned in the video that's on YouTube.  And

20 then our intelligence from the Columbus, Georgia ATF field

21 office puts Mr. Hampton at that shooting.

22 Q   All right.

23        MS. MAZZANTI:  If we can go to Government's Exhibit

24 13.

25        (Begin video playback, Government's Exhibit 13.)

1       (Stop video playback, Government's Exhibit 13.)

2   BY MS. MAZZANTI:

3   Q    In the very beginning it says -- what does it say?

4   A    You hear a voice say "Finesse is here."

5   Q    Okay.  And if we can --

6       (Resume playback of video, Government's Exhibit No. 13.)

7       (End playback of video, Government's Exhibit No. 13.)

8           MS. MAZZANTI:  Your Honor, at this time I move to

9   admit Government's Exhibit 13.

10          MS. LYBRAND:  No objection.

11          THE COURT:  All right.  Be received.

12      (Government's Exhibit No. 13 identified and received.)

13          THE WITNESS:  The video on social media is actually

14  labeled "Finesse2Tymes Moneybagg Yo Shootout."

15  BY MS. MAZZANTI:

16  Q    All right.  If we can go to April 1st of 2017, there was

17  -- have you received information that there was a -- another

18  shooting incident outside of a Memphis club?

19  A    Yes.  Mr. Hampton was performing at this club and the

20  individual that you saw in this one -- not that you saw, but

21  the individual who was performing when this video was made is

22  Moneybagg Yo.  Mr. Hampton is now performing outside a club in

23  Memphis.  Moneybagg Yo shows up and shoots up his performance.

24  And two people are injured as they shoot through the door.

25  Q    And those are the allegations to date?

1  A    Those are the allegations, yes.

2  Q    If we can go to Government's Exhibit 6.  Did Mr. Hampton

3  have interaction with the Bartlett Police Department, was he

4  arrested in April of 2017 with respect to no driver's license,

5  theft over 1,000 dollars, possession of a controlled

6  substance, and altered auto serial number according to

7  ACIC/NCIC?

8  A    Yes.  And he's out on bond for that now, I believe.

9  Q    Okay.  And was there a post related to this incident --

10 A    Yes.

11 Q    -- posted on social media?

12 A    It was posted on social media and it basically says fuck

13 Bartlett Police, just took my money, my weed, and my car.  And

14 the TF would be the fuck dog.

15 Q    Okay.  And law enforcement records indicate that there was

16 a failure to -- to appear with respect to Bartlett Police

17 Department on 6/18 of '17?

18 A    Yes, he did not show up for court for that.

19          MS. MAZZANTI:  Your Honor, at this time I move to

20 admit Government's Exhibit 6.

21          THE COURT:  Any objection?

22          MS. LYBRAND:  No, Your Honor.

23          THE COURT:  All right.  It will be received.

24     (Government's Exhibit No. 6 identified and received.)

25 BY MS. MAZZANTI:

1   Q   All right.  If we can go to Government's Exhibit 7,

2   please.  All right.  Can you describe this post?

3   A   This is a Facebook post by Ricky L. Hampton on April 8th

4   of this year.  It's talking about one of his concerts.

5                   "Shook the stage by myself.  What

6                   nigga you know go to another city

7                   and state by theyself.  Need no

8                   nigga.  All I need is one mic and

9                   a Tech-9."

10      Tech-9 would refer -- is referring to a Tech-9,

11  9-millimeter assault pistol.

12          MS. MAZZANTI:  At this time, I move to admit

13  Government's Exhibit 7.

14          MS. LYBRAND:  No objection.

15          THE COURT:  All right.  Be received.

16      (Government's Exhibit No. 7 identified and received.)

17  BY MS. MAZZANTI:

18  Q   If we could go to Government's Exhibit 8, please.  Was

19  there a video taken off of social media or YouTube with

20  respect to Mr. Hampton and an Alabama appearance?

21  A   Yes.  This video is labeled Finesse2Tymes explains why he

22  didn't perform in Alabama.  That's not a direct quote, but

23  that was the gist of the what the label is.  And it's -- it's

24  Mr. Hampton talking about they wouldn't let him in with a gun,

25  they wouldn't let his security in with a gun, he doesn't

1   travel anywhere -- the video speaks for itself.

2        (Government's Exhibit No. 8 identified.)

3             MS. MAZZANTI:   Okay.   If we could go to the ten

4   minute marker, please?

5        (Begin video playback, Government's Exhibit No. 8.)

6        (Stop video playback, Government's Exhibit No. 8.)

7   BY MS. MAZZANTI:

8   Q    Okay.   And in the video --

9        (Resume video playback, Government's Exhibit No. 8.)

10       (End video playback, Government's Exhibit No. 8.)

11  BY MS. MAZZANTI:

12  Q    Okay.   And there is a reference in that video to a strap.

13  Is that a -- is that a law -- a term known to law enforcement

14  that is typically used?

15  A    Yes.   A strap refers to a gun.

16  Q    And the video also shows Mr. Hampton doing what, it

17  appears?

18  A    He appears to be rolling what is referred to as a blunt.

19  It's where you would open up a cigar, take out the tobacco,

20  and fill it with marijuana, and roll it back up.

21       Mr. Hampton actually refers to this on several social

22  media posts where he prefers --

23  Q    A particular --

24  A    -- Backwoods to whatever the other brand is.   But he even

25  talks about the brand he likes to wrap his marijuana with.

1          MS. MAZZANTI:  All right.  Your Honor, at this time I

2   move to admit Government's Exhibit 8, please.

3          MS. LYBRAND:  No objection.

4          THE COURT:  It will be admitted.

5      (Government's Exhibit No. 8 received.)

6   BY MS. MAZZANTI:

7   Q   If we could go to Government's Exhibit 9, please.  And

8   it's another social media post from May 3rd of 2017; is that

9   right?

10  A   Yes.

11  Q   And what does this social media post reflect on Mr.

12  Hampton's page?

13  A   It said:

14                  "I just smoked a pound in a day.

15                  I'm Smoky Robinson."

16      But if you'll scroll down, that is an Olympic Arms AR-15,

17  and the only reason I know that is because it was identified

18  by Kentrell Gwynn as his rifle, his -- his post was "Finesse

19  Gang" -- "Finesse Gang Dirt," is Mr. Gwynn standing against

20  the door with his thigh rig on and that gun, according to him,

21  hanging by his side.  And that gun was purchased by Mr. Gwynn.

22      (Government's Exhibit No. 9 identified.)

23  BY MS. MAZZANTI:

24  Q   All right.  If we can go to --

25          MS. MAZZANTI:  At this time I move to admit

1  Government's Exhibit 9, please.

2          THE COURT:  Any objection?

3          MS. LYBRAND:  No objection, Your Honor.

4          THE COURT:  All right.  Be admitted.

5      (Government's Exhibit No. 9 received.)

6  BY MS. MAZZANTI:

7  Q   All right.  And Government's Exhibit 15, please.  And what

8  is reflected in this post?

9  A   It appears to be someone -- Mr. Hampton smoking a joint

10  with that Olympic Arms AR-15 type rifle sitting next to him.

11  Q   And it's a May 20th post?

12  A   Yes.

13          MS. MAZZANTI:  Move to admit Government's Exhibit 15,

14  please.

15          MS. LYBRAND:  No objection.

16          THE COURT:  Be admitted.

17      (Government's Exhibit No. 15 identified and received.)

18  BY MS. MAZZANTI:

19  Q   All right.  If we can go to Government's Exhibit 12,

20  please.  On May 29th, 2017, did you -- or was there a video

21  uploaded to YouTube that relates to this investigation?

22  A   Yes.

23  Q   Okay.  And is this the video that we're about to watch

24  here?

25  A   Yes.

1        (Government's Exhibit No. 12 identified.)

2        (Begin video playback, Government's Exhibit No. 12.)

3             THE WITNESS:  There is sound to this.  If you get

4    farther here.  Oops, come back.  I don't know if you can do

5    that.

6             May I stand up again, Your Honor?

7             THE COURT:  Yes.

8             THE WITNESS:  Right there.  This is the RAS-47

9    AK-style pistol that was purchased by Mr. Gwynn.  If -- we

10   can look at the picture later, but you can see the site has

11   got the half circle, where a Draco Romanian AK pistol will

12   have a completely enclosed site.  But this has the flash hider

13   that's distinctive to the RAS-47, the -- the Magpul MOE

14   furniture on it is clearly visible as he turns it, which is

15   the way the RAS-47 comes.  It also has a polymer mag, not a

16   metal mag like a Draco would have.  But you can see in this

17   picture it's a polymer mag.  And this is the gun we recovered

18   in Birmingham.

19       (Stop video playback, Government's Exhibit No. 12.)

20   BY MS. MAZZANTI:

21   Q    Then go to Government's Exhibit 12a.  And is this a still-

22   shot from that video?

23   A    Yes.

24   Q    Okay.

25   A    That's about where Mr. Givens stopped it at.

1      (Government's Exhibit No. 12a identified.)

2           MS. MAZZANTI:  I move to admit Government's Exhibit

3  12 and 12a, please.

4           MS. LYBRAND:  No objection.

5           THE COURT:  Be received.

6      (Government's Exhibits No. 12 and 12a received.)

7  BY MS. MAZZANTI:

8  Q   There has been some discussion about firearms purchased by

9  Mr. Gwynn, and Mr. Hampton's possession of firearms.  Did you

10  recover video from July 1, 2017 with respect to the .40

11  caliber firearm that you discussed previously in this case?

12  A   Yes.  I believe it's a video from American Loan in

13  Memphis.  It's approximately ten hours after the shooting here

14  in Little Rock.  It is Mr. Gwynn and Mr. Hampton in the -- the

15  store, they're both looking in the gun cabinet.  You see them

16  over by the gun cabinet.  The clerk takes out a Glock-23, .40

17  caliber pistol and walks over to where Mr. Gwynn is standing.

18  Mr. Gwynn counts out piles of 20 dollar bills with Mr. Hampton

19  standing within feet of him.  At one time, as he's counting

20  out the money, Mr. Hampton actually leans over and whispers

21  something into Mr. Gwynn's ear, and you see Mr. Gwynn kind of

22  motion him off.  So he goes back to the firearms transaction.

23      And in my professional ATF opinion, that was a straw

24  purchase, where the gun was purchased for Mr. Hampton shortly

25  after the shooting here.  And evidence that was recovered in

1  Birmingham would lead you to believe that, with Mr. Gwynn

2  already having a gun on his side, Mr. Hampton in the

3  passenger's seat, the Glock is now laying in Mr. Gwynn's lap,

4  as the magazine and receipt for the purchase of the firearm --

5          MS. LYBRAND:  Your Honor, is this in response to a

6  question?

7          THE COURT:  I think it is, yes.

8          THE WITNESS:  Like I was stating, as the -- the

9  magazine for that gun and the receipt for the purchase of that

10 gun is in the door next to Mr. Hampton, in the pocket of the

11 door, where he drove from Memphis to Birmingham with that

12 firearm.

13         MS. MAZZANTI:  Can I have just a moment, Your Honor?

14         THE COURT:  All right.

15         MS. MAZZANTI:  That's all I have, Your Honor.

16         THE COURT:  All right.  You may cross.

17         MS. LYBRAND:  Thank you, Your Honor.

18                      CROSS EXAMINATION

19 BY MS. LYBRAND:

20 Q   Agent Newman, you stated that your research shows -- or I

21 should say your investigation shows that Mr. Hampton completed

22 13 shows, correct?

23 A   Yes.

24 Q   And, in fact, there are three of those shows that he

25 didn't perform at and was not paid for, and that would be

1  Blytheville, Birmingham, and Indiana; does your investigation

2  show that as well?

3  A   No, I'm going off of the posters that he had printed where

4  he was advertising he was performing.

5  Q   Okay.  So you're -- what you're testifying to that he

6  performed at is what he was promoting that he would be

7  performing at on social media?

8  A   Correct.

9  Q   Okay.  As it relates to Government's Exhibit 11, this

10 picture -- do you have exhibits up there with you?

11 A   No, ma'am, I do not.

12 Q   Okay.  You recognize this picture, right?

13 A   Yes, it was one of the Facebook posts.

14 Q   Okay.  And you testified that that was stacks of 100

15 dollar bills, correct?

16 A   That's what it appears to be.

17 Q   Okay.  And, in fact, what that is, is stacks of currency,

18 we know for a fact, with a hundred dollar bill on the top,

19 correct?

20 A   Yes.

21 Q   We don't know what the denomination is below that?

22 A   You're correct.

23 Q   You have no testimony as to what the actual denominations

24 were, you're just basing your conclusions off of this picture,

25 correct?

1  A   I'm basing my conclusions off of that picture.

2  Q   Thank you.  The video, Government's first video, relating

3  to the Forrest City altercation.  What people are chanting,

4  you stated that people are calling Mr. Hampton out by name,

5  correct; that was your testimony?

6  A   I stated that they were calling him by the term that he

7  performs under, Finesse2Tymes.

8  Q   Okay.  But, in fact, what they're saying is "Finesse

9  Gang."  That's what they're chanting, right?

10  A   Well, they say Finesse2Tymes repeatedly.  In fact, there's

11  one individual, that's an unidentified individual, when he

12  stands up with the RAS-47 pistol towards the end of the video,

13  he --

14  Q   I'm referencing the first video that the Government

15  played.

16  A   Well, it's all one video, it's just in two sections.  So

17  they say --

18  Q   Okay.

19  A   -- "Finesse, don't do it.  Finesse, don't do it."

20  Q   Okay.  So let me ask the question.  Is your answer to my

21  question no, or is your answer they identified him as Finesse

22  Gang and as Finesse2Tymes?

23  A   They have identified him as Finesse2Tymes and Finesse.

24  Q   Okay.  And his brother -- you've investigated his brother

25  and multiple other people on social media as part of this

1    case, right?

2    A    Correct.

3    Q    And so you're aware that his brother's name on social

4    media is something like Finesse Gang Bezel or something like

5    that, right?  It's "Finesse Gang" and then some other word at

6    the end, correct?

7    A    It's not Finesse2Tymes, you're correct.

8    Q    Right.  And so that's -- and you've -- you've reviewed

9    videos at different shows of his and you've heard people

10   chanting "Finesse Gang" and "Finesse2Tymes" before those

11   shows, right?

12   A    Yes.

13   Q    Okay.  Now both of the Forrest City incidents -- but the

14   person in that vehicle reported that she was shot at, right?

15   A    Yes.

16   Q    And she identified Mr. Hampton as the shooter?

17   A    Yes.

18   Q    But neither of those videos show anyone firing shots,

19   correct?

20   A    Correct.

21   Q    Okay.  And you spoke to that -- the victim in that case as

22   well, right?

23   A    Yes.

24   Q    Okay.  And you testified that she told you that as soon as

25   she backed her car up and turned around, that's when the

1  gunshots came?

2  A   She said that's when Finesse2Tymes shot at her.

3  Q   So my question to you is, she turned her car around and

4  that's when she heard gunshots; is that accurate?

5  A   I'm merely repeating what her statement was.  I wasn't

6  there.  She said that she turned her car around and

7  Finesse2Tymes shot at her.

8  Q   Okay.  So what was the time line -- and you interviewed

9  this witness, this is not just you recounting from a report.

10  What was the time line between her backing her car up, turning

11  it around, and gunshots?

12  A   She said as soon as she turned the car around the gunshots

13  happened.

14  Q   Okay.  But and there were multiple people in that area,

15  obviously, because we have videos from Facebook and other

16  social media that we've seen today.  There were multiple

17  people with smart phones recording this incident, right?

18  A   Yes.

19  Q   And there's no video of anyone shooting at this car,

20  correct?

21  A   I don't know.  I still have a search warrant pending on

22  some video from the club that I have not got yet.

23  Q   Okay.  To the best of your knowledge, at this point,

24  there's no video of anyone shooting at that car, right?

25  A   None that I've discovered in my investigation.

1    Q    Nothing has been turned over to the defense showing anyone

2    shooting at that car, correct?

3    A    I have not discovered any in my investigation.

4    Q    Okay.  And there was a bullet fragment that was recovered

5    from the victim in that case?

6    A    That is correct.

7    Q    Did that bullet fragment -- has it been matched to what

8    type of ammunition it is yet?

9    A    It's at the state crime lab.

10   Q    The March -- I believe you said it was a June 27th video

11   in Marianna.  Was that -- did you describe that as a silver

12   Mercedes?

13   A    It is a silver Mercedes E500.

14   Q    And you identified the person driving that vehicle was

15   Kentrell Gwynn?

16   A    Mr. Gwynn identified himself as driving that vehicle.

17   Q    He did identify himself.  Okay.  On the criminal complaint

18   for Mr. Hampton, you stated that you had obtained information

19   that he was going to Birmingham for a show, right?

20   A    Yes.

21   Q    Okay.  And, in fact, he -- he made no secret of that, and

22   it was posted on his social media, and that he would be at a

23   certain club at a certain time, right?

24   A    As from the video we saw, he didn't make a secret about

25   many things on social media.

1  Q    So to answer my question, would that be a yes?

2  A    That's -- it was on social media.

3  Q    It was on social media?

4  A    Yes.

5  Q    Thank you.  And you talked about you said that there was

6  video of Mr. Hampton purchasing guns, and I believe you

7  clarified this later, but I want to be sure that it's clear,

8  your testimony is your personal belief is that Mr. Gwynn was a

9  straw purchaser for Mr. Hampton, right?

10  A    My professional belief, not my personal belief.

11  Q    Your professional belief is that Mr. Gwynn was a straw

12  purchaser for Mr. Hampton of firearms?

13  A    Having worked many straw purchase --

14  Q    Is that a yes?

15  A    Having worked many straw purchase cases, where people buy

16  guns for convicted felons --

17  Q    I understand.

18  A    -- because they're unable to do it, the manner in which

19  this sale took place would be typical of a straw purchase.

20  Also in this case --

21  Q    So is that a yes?  Can you answer my question?

22  A    Yes, I can, I'm trying to.  Also in this --

23  Q    Do you believe that Mr. --

24  A    -- case --

25  Q    -- no, I'm not asking about also in this case.  Do you

1   believe that Mr. Gwynn straw purchased a firearm for Mr.

2   Hampton?

3   A    Yes.

4   Q    Thank you.  And on the video from the pawn shop, what your

5   testimony is, it shows that Mr. Gwynn was the one laying down

6   cash for the firearm, right?

7   A    Uh-huh.

8   Q    Mr. Hampton was in close proximity?

9   A    Within a few feet of him.

10  Q    Right.  And that the firearms were registered to Mr.

11  Gwynn, correct?

12  A    There is no firearm registration.

13  Q    You're correct.  Only for certain types of prohibited

14  firearms.  I do know that.

15  A    Okay.

16  Q    I know NFA.  The firearms were purchased, as far as ATF --

17  I mean, when someone purchases a firearm, the pawn shop runs

18  their name through the ATF system, right --

19  A    No.

20  Q    -- unless it's a person to person?

21  A    FBI runs that stuff.

22  Q    The FBI.

23  A    According to the FFL records, that gun was purchased by

24  Mr. Kentrell Gwynn.

25  Q    Perfect.  Thank you.  And you said that Mr. Hampton told

1 you that that gun didn't belong to the backseat passenger when

2 you stopped the car, right, that's in his statement?

3 A    Which -- which gun are you referring to?  We're talking

4 about two different guns now.

5 Q    The gun that was in the backseat when the car was stopped

6 in Birmingham, Alabama.

7 A    You're referring to the RAS-47, correct?

8 Q    The -- what they refer --

9 A    The pistol?

10 Q    Which -- okay, let me ask you.

11 A    The AK-47 pistol?

12 Q    Which gun was in the backseat?

13 A    The AK-47 pistol.

14 Q    Okay.  That's the one I'm talking about.

15 A    Okay.

16 Q    And Mr. Hampton said that the backseat passenger, that was

17 not his gun, right?

18 A    Told -- yes, he said that wasn't his gun.

19 Q    And he said it was Mr. Gwynn's gun, correct?

20 A    Yes.

21 Q    Okay.  And in Mr. Hampton's statement, he doesn't state

22 that he was arrested in Illinois, he states his brother was

23 arrested in Illinois for weapons possession, right?

24 A    I believe he said his crew or his entourage.  I -- I've

25 never seen anything where he says his brother was arrested.

1   Q   Okay.  He -- but he does not indicate that he personally

2   was arrested; he states that someone affiliated with him was

3   arrested in Illinois and that he had to pay a bond to get them

4   out?

5   A   And then he also states that --

6   Q   I'm asking you that question.

7   A   Well, I'm trying to answer it for you.  Give me just a

8   second.  He was arrested for marijuana --

9   Q   What page of his statement are you on?  Are you looking at

10  the written statement?

11  A   Excuse me?

12  Q   Are you looking at the written statement?

13  A   I'm looking at my notes.  I'm trying to find it.  I'm

14  sorry.

15  Q   Looking at the transcript.

16  A   The transcript of what?

17  Q   That's fine.  I'll move forward.  The transcript I was

18  provided of his statement.

19  A   Okay.

20  Q   Now let's go to some of the arrests that you discussed in

21  detail.  As it relates to there was -- you talked about a 2007

22  threatening phone call.  And that actually was never charged,

23  that's a police report that involves Mr. Hampton, correct?

24  A   I believe that was a 2016 harassing phone call from jail.

25  Q   I'm talking about the first call to a girl --

1   A   Oh, the first one.  1/8 of '07?  Is that the one you're

2   referring to?

3   Q   Yes.  That -- that was -- he was never charged in that

4   case?

5   A   I just have the police report where it says:

6                      "I'm gonna get you, ho.  You gonna

7                      die."

8   Q   Okay.  So my question is, on -- have you reviewed an NCIC

9   in this case?

10  A   Yes.

11  Q   Okay.  So he's never charged, there's no charge for that

12  in his NCIC?

13  A   Well, all charges don't make it to NCIC, unfortunately,

14  with police departments.

15  Q   So you have no idea whether he was charged or not?

16  A   I do not.  I know there's a police report from Memphis

17  that says that.

18  Q   You didn't investigate whether he was charged?

19  A   I haven't looked into that yet.  I have the police report.

20  Q   All right.  So, and then he was not charged in the

21  mountain bike theft case either; you don't have any proof that

22  he was charged, do you, whether you investigated it or not?

23  A   I have the police report where he was a suspect in it.

24  Q   Okay.  We just -- we're just talking about police reports?

25  A   Yes.

1  Q   Okay.  In fact, what we know is that he has only two prior

2  felony convictions, and those are from 2008 for aggravated

3  robbery, correct?

4  A   Correct.  And one of them was involving --

5  Q   And the 2012 --

6  A   -- a shotgun.

7  Q   -- case, where that was alleged to be a burglary, he was

8  never prosecuted on that -- where his prints were found that

9  you discussed, he was never prosecuted on that case and that

10 was his girlfriend's house?

11 A   I don't think the burglary was his girlfriend's house.

12 Q   Okay.  So it's your belief that that wasn't his

13 girlfriend?

14 A   I don't know all of his girlfriends.

15 Q   Okay.  That's accurate.  Let's talk a little bit about the

16 Columbus, Georgia -- it was Columbus, Georgia, correct?

17 A   Yes.

18 Q   Okay.  Now none of the victims actually placed Mr. Hampton

19 there, correct?

20 A   No, but social media places him there and our --

21 Q   My question to you --

22 A   -- intelligence that we have --

23 Q   -- my question to you, Agent Newman, none of the victims

24 placed Mr. Hampton at that show?

25 A   And my answer to you is --

1  Q    Is that a yes?

2  A    -- that our intelligence and investigations --

3  Q    I understand --

4  A    -- with ATF placed him there.  There's also a video that

5  says --

6  Q    I understand what the evidence is, but I'm asking you

7  questions and all I need you to do is just answer those.  Now

8  he wasn't performing at that show, correct?

9  A    No.  Moneybagg Yo was performing at that show.

10 Q    Okay.  In the beginning of that video, Government's 13,

11 what they say is "Finesse gang"?

12 A    No.  They say "Finesse here."

13        MS. LYBRAND:  Can we play Government's 13 one more

14 time?

15     (Begin video playback, Government's Exhibit No. 13.)

16     (End video playback, Government's Exhibit No. 13.)

17        MS. LYBRAND:  Okay.

18 BY MS. LYBRAND:

19 Q    And you stated that that video was titled "Finesse2Tymes

20 Moneybagg Yo," I think, "Shootout."  Right?

21 A    Yes.

22 Q    Okay.  And that was titled by -- we don't know who that

23 was titled by?

24 A    By whoever posted it, yes.

25 Q    Okay.  But it was never posted or re-posted by Mr. Hampton

1  that you know of, correct?

2  A    Not that I know of.

3  Q    Okay.  And we don't -- to the best of your knowledge, it

4  was never re-posted or posted by anyone in his camp -- or

5  anyone that was affiliated with him, to the best of your

6  knowledge, right?

7  A    I did not find it through his Facebook.

8  Q    Okay.  Okay.  And as it relates to that failure to appear

9  out of Bartlett, Tennessee, he turned himself in on that

10 warrant, I believe a day after it was issued, correct?

11 A    Don't know.  I know there was a failure -- there was a

12 failure to appear.

13 Q    Okay.  The gun in Government's 9 and 15.  I can show those

14 to you again.  This gun that's in --

15 A    Can you -- I'm -- all right.  Yes.  The --

16 Q    Government's 9 and 15.

17 A    The Olympic Arms AR-15 is which one you're referring to?

18 Q    This gun?

19 A    Yes.  Correct.

20 Q    Okay.  That's the gun you stated Mr. Gwynn identified as

21 his own, correct?

22 A    He said it was his Olympic AR-15.

23 Q    Okay.  And your investigation reveals that, at least for

24 some period of time, that Mr. Gwynn traveled with Mr. Hampton

25 routinely?

1   A    From about May on, yes.

2   Q    Okay.  The case that Mr. Hampton is indicted on in federal

3   court relates only to the Forrest City incident, correct?

4   A    Correct.

5   Q    Okay.  When was the warrant issued by Forrest City?

6   A    I don't have an exact date on it.  I'll have to look at my

7   case file.

8   Q    Agent Newman, I'm showing you the warrant from the state

9   case.

10  A    Yeah.

11  Q    And does that show an issue date of June 26th of 2017?

12  A    Correct.

13  Q    Okay.  And what was -- so June 26th of 2017, Forrest City

14  issues a warrant.  What was the date of the Little Rock show

15  at which Mr. Hampton performed?

16  A    June 30th.

17  Q    June 30th.  Okay.  And what date was he arrested in

18  Birmingham?

19  A    July 2nd.

20  Q    Okay.

21       MS. LYBRAND:  Your Honor, may I have a moment to

22  confer with my client?

23       THE COURT:  Yes.

24   (Ms. Lybrand confers with the Defendant, off the record.)

25       MS. LYBRAND:  Pass the witness, Your Honor.

1          THE COURT:  All right.  Any redirect?

2          MS. MAZZANTI:  No, Your Honor.

3          THE COURT:  All right.  You may stand aside.  Thank

4    you.

5          THE WITNESS:  Thank you, Your Honor.

6      (Witness steps down.)

7          MS. MAZZANTI:  The United States has no further

8    witnesses, Your Honor.

9          THE COURT:  All right.  Ms. Lybrand, you may call

10   your first witness.

11         MS. LYBRAND:  Your Honor, the defense calls Audrey

12   Webb.

13     AUDREY WEBB, DEFENDANT'S WITNESS, SWORN.

14                   DIRECT EXAMINATION

15   BY MS. LYBRAND:

16   Q   Ms. Webb, can you please state your full name?

17   A   Audrey Webb.  Audrey Jean Webb.

18   Q   Go ahead and pull that microphone down towards you.  And,

19   Ms. Webb, are you familiar with Ricky Hampton?

20   A   Yes.

21   Q   What's your relationship to him?

22   A   He's my boyfriend.

23   Q   Okay.  And, Ms. Webb, go ahead and state your date of

24   birth, please.

25   A   July 7, '90.

1  Q   And where do you live?

2  A   682 Sagamore Cove, Memphis, Tennessee.

3  Q   All right.  And are you here today to present yourself to

4  the Court to be considered as Mr. Hampton's third party

5  custodian?

6  A   Yes.

7  Q   And have I discussed with you the responsibilities of a

8  third party custodian?

9  A   Yes.

10 Q   So you're aware that if Judge Kearney releases Mr. Hampton

11 that he'll set conditions and those are rules that he has to

12 follow?

13 A   Yes.

14 Q   And if he breaks those rules, your job is to turn him in?

15 A   Right.

16 Q   Are you sure you're going to be able to do that?

17 A   Yes.

18 Q   Okay.  You're pregnant with his baby right now, right?

19 A   I am.

20 Q   Okay.  And you -- you can assure this Court that if he

21 breaks a rule, that you will let Probation and the Court know?

22 A   I will.

23 Q   Okay.  What do you do by trade, Ms. Webb?

24 A   I'm actually a hairstylist, but I haven't been working

25 since I've been pregnant.

1  Q   Okay.  And how are you making ends meet at this point if

2  you're not working?

3  A   Well, he's been -- he's been the provider.

4  Q   Okay.  And now that he's locked up, how are you making

5  ends meet?

6  A   I'm -- I'm kind of not right now.

7  Q   Is his family helping you out?

8  A   Yeah, the best that they can, but he --

9  Q   Is there --

10 A   -- he's kind of -- he helps everybody --

11 Q   Okay.

12 A   -- [indiscernible].  So.

13 Q   Okay.  And by "he," you mean Ricky?

14 A   Ricky.  Yes.

15 Q   Okay.  And how many people live in that house on Sagamore

16 Cove?

17 A   Me and my three kids.

18 Q   Okay.  And is -- that's a three bedroom, two bath house?

19 A   Yes, ma'am.

20 Q   Okay.  How long have you known Ricky Hampton?

21 A   It's been a little over three years, but we've actually

22 been together for about almost a year now, so.

23 Q   Okay.  And you're aware that he has a criminal history?

24 A   Yes.

25 Q   You're aware that he has felony convictions for aggravated

1  robbery?

2  A    Yes.

3  Q    Have you ever had any issues with him?

4  A    No.

5  Q    Has he ever gotten out of line with you?

6  A    No.

7  Q    Violent?

8  A    No.

9  Q    Aggressive?

10 A    No.

11 Q    How old are your kids that live in the house?

12 A    Six, nine, and twelve.

13 Q    Okay.  And Ricky has two other children, correct?

14 A    Yes.

15 Q    How old -- how old are his other kids?

16 A    Two month old and a six year old.

17          MS. LYBRAND:  Your Honor, I'll pass the witness.

18          THE COURT:  All right.

19                      CROSS EXAMINATION

20 BY MS. MAZZANTI:

21 Q    Good afternoon, Ms. Webb.

22 A    Hey.

23 Q    Do you have a nickname?

24 A    [No audible response.]

25 Q    Do you have a nickname?

1   A   Do I have a nickname?

2   Q   Yeah, do you go by a nickname?

3   A   Pooh.

4   Q   Okay.  Do you do any sort of business for Mr. Hampton?

5   A   I do -- I do his booking --

6   Q   You do --

7   A   -- his shows.  His shows.  Uh-huh.

8   Q   Okay.  So you do his shows?

9   A   I book his shows.

10  Q   Okay.  How much does he charge for shows?

11  A   Between 6,000 and 6,500, depending on location.

12  Q   And about how many shows does he -- have you booked for

13  him since he's been out of jail?

14  A   Since he's been out?

15  Q   Since he's been out of prison?

16  A   Oh, well, I just -- I kind of started booking him late,

17  but --

18  Q   When did you start booking him?

19  A   I believe at the beginning of April.

20  Q   Okay.  Do you remember when he got out of jail -- out of

21  prison?

22  A   August the 23rd --

23  Q   Of 2016 --

24  A   -- yeah.

25  Q   -- 2016?

1   A   2016.

2   Q   Sorry I didn't mean to talk over you.  August 23rd, 2016?

3   A   Uh-huh.

4   Q   Okay.  Were you with him on that day?

5   A   No.

6   Q   And since the time you've started booking his shows in,

7   you said, April of 2017 or so --

8   A   Uh-huh.

9   Q   -- how many shows have you booked for him?

10  A   I'm not sure, but it's -- it's been about more than ten.

11  Q   Okay.  About how many on average per week would you say?

12  A   Two.

13  Q   About two shows a week?

14  A   Yeah.  He does two shows a week.

15  Q   And he's been living with you off and on for how long?

16  A   About since the beginning of the year, like January, we've

17  been together -- living together.

18  Q   Does he live with you full time?

19  A   When he's at home, yes.  When he's not out of town, he

20  comes home, like, to my house.

21  Q   He doesn't stay with another woman?

22  A   No.

23  Q   Okay.  So he doesn't split time between his other

24  girlfriend's house?

25  A   He don't have another girlfriend.

1   Q    Do you know who Shawanda Jones is?

2   A    That's his two month old son's mother.

3   Q    Okay.  Does he split time between staying at her house and

4   staying at your house?

5   A    I mean, he goes to visit, to see -- you know, see his

6   child.

7   Q    Okay.  I don't -- I don't mean visit.  I just mean

8   overnight stays.

9   A    No.

10  Q    So he's been living with you when he's in town since

11  January of this year?

12  A    I -- I had a apartment and my apartment caught on fire in

13  February.

14  Q    Uh-huh.

15  A    So in between the time that my apartment caught on fire,

16  we was living in and out of rooms.  The house that I have now,

17  we've been living there for about four months now.

18  Q    Okay.

19  A    So it's -- it's not a -- a -- like a physical address as

20  we actually been living at.

21  Q    So you've been staying at the place you're staying at now

22  for four months?

23  A    Yes.

24  Q    And Mr. Hampton, when he's in town, has been staying with

25  you?

1   A    Yes.

2   Q    And in February, you had a fire at your other place?

3   A    Right.

4   Q    And you said you were staying between rooms from February

5   until about four months ago?

6   A    Right.

7   Q    What rooms are you referring to; like people's houses or

8   hotel rooms?

9   A    No.  Hotel rooms.

10  Q    Okay.  Do you travel with the defendant?

11  A    Not since I've been pregnant.

12  Q    Are you aware of the number of shooting incidents that

13  have occurred at shows that Mr. Hampton has been performing

14  at?

15  A    The recent ones, yes, but as far as the -- the Moneybagg

16  Yo incident, like I -- some of that stuff is new to me, so.

17  Q    Okay.  Does that cause you any concern, having small

18  children at your house?

19  A    No, because he -- I mean, he doesn't bring it home, so.

20  Like I said, it's -- you know, some of it, it's kind of new.

21  Q    And you -- have you observed the defendant using drugs in

22  your presence?

23  A    Well, he -- he smoke weed.

24  Q    He smokes weed?

25  A    Uh-huh.

1  Q   Okay.  And he does that at you all's home?

2  A   Not really.  Like, my kids -- sometimes my kids are there,

3  sometimes they're not.  He doesn't do it in front of my kids.

4  I don't mind him doing it in front of me.

5  Q   And have you observed the defendant in possession of

6  firearms?

7  A   Not without his security.

8  Q   So you haven't observed him personally in possession of

9  firearms?

10  A   No, not besides the videos and -- and without his

11  security, no.

12  Q   Were you home -- was that video taken -- whenever he

13  pointed the AK-style pistol up at the camera, was that video

14  taken at you all's residence or elsewhere?

15  A   I couldn't see it clearly.  I'm not -- I'm not sure.

16          MS. MAZZANTI:  Will you go ahead and play it, please?

17      (Begin video playback, Government's Exhibit 12.)

18      (End video playback, Government's Exhibit 12.)

19          THE WITNESS:  No, that's not my house.

20  BY MS. MAZZANTI:

21  Q   That's not your house?  Okay.

22          MS. MAZZANTI:  And just for the record, that's

23  Government's Exhibit 12.  May I have just a moment, Your

24  Honor?

25          THE COURT:  All right.

1              MS. MAZZANTI:  No further questions.

2              THE COURT:  All right.  Any redirect?

3              MS. LYBRAND:  Yes, Your Honor.  Briefly.

4                        REDIRECT EXAMINATION

5    BY MS. LYBRAND:

6    Q   Ms. Webb, you are aware that Mr. Hampton -- or I should

7    say, let me ask you, are you aware that Mr. Hampton asserts

8    that he has been in possession of prop-style guns in the past?

9    A   Yes.

10   Q   And has he advised you that he uses those for photo shoots

11   and different things?

12   A   Yes, and just for the image and, yeah, like you said,

13   video shoots, photo shoots, things like that.

14   Q   Okay.

15             MS. LYBRAND:  Nothing further, Your Honor.

16             THE COURT:  All right.

17                        RECROSS EXAMINATION

18   BY MS. MAZZANTI:

19   Q   Have you had conversations on jail phones with Mr. Hampton

20   since he was incarcerated in Birmingham?

21   A   Uh-huh.

22   Q   Is that yes?

23   A   Yes.

24   Q   Sorry, it doesn't get uh-huh and uh-uhs.

25   A   Yeah.  That's fine.  That's fine.

1  Q    And have you had any discussions with Mr. Hampton about

2  obtaining prop-style firearms or weapons in this -- for

3  purposes of this case on the Internet?

4  A    Yes, in case we needed it, yes.

5  Q    And order them on the Internet?

6  A    Huh?

7  Q    And go ahead and order them on the Internet for this case?

8  A    Oh, I'm not understanding.  What you say?

9  Q    You've had some discussions with Mr. Hampton about

10 ordering prop --

11 A    Oh, ordering?  No.  No.  We -- it's not ordering.  It's

12 something that we have already had.

13 Q    Okay.  So you didn't have any discussions with Mr. Hampton

14 about ordering some --

15 A    No.

16 Q    -- prop-style weapons online?

17 A    No.

18          MS. MAZZANTI:  Okay.  That's all, Your Honor.

19          THE COURT:  Any other questions?

20          MS. LYBRAND:  No, Your Honor.

21          THE COURT:  You may stand down.  Thank you.

22          THE WITNESS:  Thank you.

23     (Witness steps down.)

24          THE COURT:  Any further witnesses?

25          MS. LYBRAND:  No, Your Honor.

1          THE COURT:  All right.

2          All right.  We have now heard the evidence put on by

3    both sides.  And I'm now ready to listen to arguments.  I'll

4    listen to you first, Ms. Mazzanti.

5          MS. MAZZANTI:  Your Honor, I think that the evidence

6    in this case clearly establishes that detention is the only

7    appropriate result.

8          The defendant has been involved in a number of

9    incidents.  It seems that shootings seem to follow him, at the

10   very least.  And you also see him pointing a firearm at a

11   vehicle in the Exhibits 1 and 2 in the Facebook posts that we

12   saw that relate to the instant offense.

13         Regardless of whether or not there's any video of him

14   actually shooting, that is still a threat.  That is still a

15   threatened use of force.  And it constitutes an act of

16   violence.

17         The defendant has also clearly disregarded his

18   prohibition on possession of firearms repeatedly, as is very

19   clear, since throughout the time that we presented evidence in

20   this year, in 2017, he only got out of jail in August of last

21   year, and you heard testimony from Special Agent Newman that

22   there are social media video -- there's a social media video

23   that he represents is his first day out of the pen, where he

24   appears to be in possession of a firearm as well.

25         So, from day one, he chooses to disregard the law.

He chooses to be in possession of firearms.  And that may be because he is just disregarding the law.  It may be because of incidents that he is involved in that cause him to be in a position where he is at risk.  That also causes the Government some concern with respect to children living in a house where he might reside, because you have retaliation issues potentially if he is in these feuds with other individuals.

You heard that he has admitted possessing the firearm in this case, so the strength of the case that the Government has -- the strength of the case, that factor weighs in favor of detention.

His criminal history supports detention in this case. He is a young man, but he already has two aggravated robbery convictions from 2010.  And as reflected in the pre-bail report, he has a failure to appear in 2017.  There are a number of incident reports that the Government went through, in 2007, 2008.  2008, you'll notice there was a string of robberies where he was listed as a suspect.  He pled guilty to one of those.  All of those occurred in the same vicinity. All of those involved individuals, including him as a suspect listed in those, and all of them involved a shotgun being employed.

So, you know, there's definitely strong circumstantial evidence that Mr. Hampton was engaged in a spree of criminal conduct at that point in time.

1        In addition to that, there's more recent violent

2   conduct, where there are reports that Mr. Hampton picked up a

3   beer bottle and hit a victim over the head, where he's in a

4   disturbance at a residence and says "I'm gonna get my gun."

5   And law enforcement observed a female with red bruises on her

6   left bicep, forearm, and a red mark under her left eye.  You

7   have that same victim reporting that the defendant pushed her,

8   pulled out a gun and fired a shot in the air.  And so, he is

9   violent towards women according to the accusations in the

10  incident reports that we learned about during this detention

11  hearing.

12        He -- in 2015, there are allegations that he made

13  threats from prison, threatened to kill the victim and her

14  family.  And then, you have allegations that he stole a

15  firearm from an ex-girlfriend.

16        The videos and the YouTube posts clearly show that he

17  chooses to use controlled substances.  And I think it is

18  doubtful that he would refrain from that if released.  And

19  there is a serious question as to whether or not he would

20  appear in a competent state to appear before the Court for any

21  hearings that he may have.

22        He indicates that he doesn't go to his appearances

23  without a gun or security, repeatedly.  And so, there's no

24  indication that Mr. Hampton will refrain from possessing a

25  firearm if he is released in this case.

1          All in all, the evidence that's been presented at

2    this hearing shows that Ricky Hampton is a violent individual,

3    that he has no regard for the law, he will have no regard for

4    this Court's orders.  He's on bond, it appears, from the

5    Bartlett Police Department case.  And there's no indication

6    that he'll refrain from criminal conduct in this case if he is

7    released on bond.  And there are serious concerns that the

8    Government has about his release as it relates to other

9    individuals who may be involved in this case.

10          And so, for all of those reasons -- I won't go into

11   the mental -- mental health history, but the Court is aware of

12   that information in the pre-bail report as well, and that also

13   causes the Government some concern.

14          And so, for all of those reasons, the United States

15   is requesting that Mr. Hampton be detained until the trial of

16   this matter.

17          Thank you.

18          THE COURT:  All right.  Thank you, Ms. Mazzanti.

19          Ms. Lybrand?

20          MS. LYBRAND:  Your Honor, first and foremost, I would

21   ask the Court to consider that -- I understand that it's a

22   broad consideration under the Bail Reform Act of all the

23   factors that the Court looks at -- Mr. Hampton is indicted on

24   one count, and that relates to a Forrest City incident.

25          You heard the agent testify as to the time line of

1  when a warrant was issued in that case.  The warrant was

2  issued June 27th.  The Little Rock show occurred June 30th.

3  And he was arrested in Birmingham on July 2nd.  At that time

4  -- he's here on the Forrest City case.  The Government had the

5  ability to indict him at any point, bring him in on a criminal

6  complaint, just like they did to his bodyguard.  If they

7  deemed him to be that much of a risk, they certainly had more

8  than ample opportunity to arrest him before he performed in

9  Little Rock, before he went to Birmingham.  And the state

10  authorities, of course, as well, could have done that and

11  could have arrested him.  It wasn't until after the Little

12  Rock show that he appears to have become much more of an

13  interest to them.

14       So I would just ask the Court to consider that what

15  he's actually charged with is the Forrest City incident.  He's

16  not charged in the Little Rock incident at all.

17       I'll speak a little bit on the first point that the

18  Government seeks detention on, risk of flight.  Now, Mr.

19  Hampton is not from the Eastern District of Arkansas, but he

20  is from Memphis, which is incredibly close.  It's one district

21  over.  He's a lifelong resident.  That weighs in favor of his

22  release.

23       He doesn't have a substantial history of failures to

24  appear.  We're talking about one failure to appear on a case

25  when he asserts that he surrendered the day after he missed

1  court, when the warrant was issued.  There's been no evidence

2  presented to contradict that.  There's no warrant active

3  according to the bail report.  So we don't have a reason to

4  believe that he didn't get into compliance as quickly as he

5  states.

6          We don't have any evidence, and he would state that

7  he doesn't have assets to liquidate.  The money that he did

8  have on his books has been used towards the bond.  So, as far

9  as his ability to flee, it's certainly quite limited.  He does

10  not have a passport either.

11          As far as the second contention, that Mr. Hampton

12  presents a danger to the community, the Court has to find that

13  there are conditions that will reasonably assure his

14  appearance and the safety of the community.  And I would

15  submit the Court can do that by placing restrictions on him

16  and releasing him.

17          Mr. Hampton has two felony convictions.  So, from the

18  standpoint -- I mean, according to the Sentencing Commission,

19  that would place him where the vast -- about half of

20  defendants in criminal court have more criminal history than

21  Mr. Hampton.  So if we're actually looking at convictions, and

22  not just police reports and allegations and YouTube videos and

23  Facebook posts, we're looking at what actually in sum and

24  substance is in his criminal history, it's two prior felonies.

25  And they are for violent offenses, but it is literally just

1   two prior felonies.

2          So, almost half of the defendants that appear before

3   this Court for bond hearings have more criminal history than

4   Mr. Hampton.  So that, I would submit, weighs in his favor of

5   release as well.

6          I would ask the Court to consider, uniquely in this

7   case, Mr. Hampton is a rapper.  As a result of that, I think

8   -- this is obviously not a legal statement, but there -- there

9   is certainly a degree of puffery and image that is involved in

10  that type of lifestyle.  We see it routinely with different

11  artists.  When you hear the testimony, where they're talking

12  about prop guns, and Ms. Webb says that it -- the reason he's

13  bringing, you know, prop guns to show posters or different

14  things, is to present a certain image.  Those are all things

15  that the Court has an ability to control under the appropriate

16  conditions of release here.

17         I would ask the Court to consider the substance and

18  not just the acts which may be done for show or things that

19  might have been done to further, you know, a rap career and

20  image.

21         As Ms. Mazzanti stated, the weight of the evidence is

22  a factor that this Court is entitled to consider, but I would

23  ask the Court to remember that that is the lowest factor

24  according to *U.S. v. Motamedi* and that the Court simply just

25  has to fashion factors that would reasonably assure his

1    appearance.

2          In this case, I would submit that placing Mr. Hampton

3    on electronic monitoring, we could inspect the home in Memphis

4    before he's released and make sure that it is an appropriate

5    and suitable environment.  Ms. Webb, I would submit, presents

6    as a very responsible young lady and a good third party

7    custodian.  She has her own children and is not willing to put

8    them in any type of risk by getting herself in trouble with

9    this Court.  She certainly, of course, stands to benefit by

10   Mr. Hampton being out because of his income.  However, she

11   will not put herself in the middle of that if it -- if it

12   causes an issue for her.

13         So I'd submit that she's responsible.  She has no

14   criminal history at all.  And she's been incredibly

15   professional to deal with.  So I would submit that the defense

16   has given the Court a good third party custodian.

17         Mr. Hampton only has two prior federal -- or, I'm

18   sorry -- two prior felony convictions.  So, on that basis,

19   he's less than half -- has less than half the -- half the

20   defendants brought before a federal court have more criminal

21   history than him.

22         For those reasons, I would submit that he's not a

23   risk of flight or a danger to the community and we would ask

24   the Court to release him under any combination of conditions

25   the Court deems appropriate.

1        THE COURT:  All right.

2        You get the last word, Ms. Mazzanti.

3        MS. MAZZANTI:  Your Honor, defense counsel wants to

4   assert that Mr. Hampton's actions that may help his image in

5   the rap community are some sort of excuse or excuse some of

6   his behavior.  And I submit that it does not.

7        I submit that the victim who had a firearm pointed at

8   her would not agree with that either.

9        I submit that the victims of the incident reports,

10  that have reported that Mr. Hampton has engaged in violent

11  threats and violent behavior, would not agree with that.

12       And I would submit that the actual actions taken by

13  the defendant that are violent in nature, and his continued

14  possession of firearms despite his convicted felon status, and

15  despite the fact that he's only been out of the penitentiary

16  since 2016, all weigh in favor of his detention.

17       I further submit that the fact that he is on bond,

18  apparently, according to the pre-bail report, indicates that

19  he is willing to just act how ever he chooses to, despite

20  being on bond, and will not obey this Court's orders, and will

21  not refrain from possessing firearms, and will not appear as

22  directed with respect to appearing without being under the

23  influence of a controlled substance, and request that the

24  defendant be detained.

25       THE COURT:  All right.  I've listened carefully to

the arguments of counsel as well as the evidence that's been
produced here at this hearing.

Counsel, as always, have ably represented their
respective sides.

Counsel are also aware that under the Bail Reform Act
I'm required to release a defendant pending trial unless there
are no conditions or a combination of conditions that can
reasonably assure, not guarantee, both their appearance in
court and the safety of the community.

What we've heard today from the Government is that
Mr. Hampton has, in their view, possessed a firearm, at least
one firearm, after having been convicted twice for violent
offenses, two aggravated robberies.

We've also heard that this possession of the firearm
is reasonably connected -- that's their argument, that it's
reasonably connected to violence.  The circumstances of his
possession of the firearm specifically allege that a victim in
Forrest City was shot or at least a fragment from the bullet
hit her neck.  That's the -- that's the accusation.

The Bail Reform Act requires me to have several
factors that I consider in making a determination as to
whether or not he should be released or detained.  The first
one is the nature and circumstances of the offense charged.
Under Eighth Circuit case law, possession of a -- a felon in
possession of a firearm is not per se a violent offense.

1   However, because I can and should consider the circumstances

2   of the offense, I have to consider the evidence adduced by the

3   prosecutor regarding the violence that surrounded both this

4   particular charge and because I'm also to consider the history

5   and characteristics of the defendant I have to consider his

6   criminal history as well as his ties to the community and

7   employment, which obviously his counsel, Ms. Lybrand, would

8   have the Court consider that he is a lifelong resident of

9   Memphis with strong ties to the community there and that he's

10  employed and provides for his family.  Those go in his favor.

11          His criminal history, obviously, does not.  The

12  record shows that he's 25 years old and his arrests and/or

13  convictions began at age 15 and has, by the list of things

14  that we've heard today, continued in terms of arrests or other

15  contacts with the police where incident reports were made have

16  been fairly regular.

17          I don't think the Government has made a strong case

18  for flight risk.  There is a discussion about a failure to

19  appear on -- out of Bartlett, Tennessee.  And the counsel for

20  defendant counters that he turned himself in the following

21  day.  So, I don't -- I don't consider him a strong flight

22  risk.

23          The danger to the community though is -- there's

24  heavy evidence here that he is a danger to the community.  As

25  I indicated, the charge is simple possession of the firearm

1   after being a felon.  However, the videos that we've seen from

2   the nightclub in Forrest City, as -- as Ms. Mazzanti pointed

3   out, shows him standing in the door with the AK-style pistol,

4   pointing it at someone.  There is -- there are several pieces

5   of evidence that have been shown with him possessing --

6   appears to be possessing that same firearm on multiple

7   occasions.

8           So notwithstanding, and I have no reason to doubt

9   that Ms. Webb is sincere in her efforts and offer to be a

10  third party custodian, it is going to be the finding of the

11  Court that the defendant should be detained pending trial

12  based upon danger to the community.

13          Is there anything else that we need to take up today?

14          MS. MAZZANTI:  No, Your Honor.

15          MS. LYBRAND:  No, Your Honor.

16          THE COURT:  All right.  We'll be in recess.

17      (Adjournment at 4:06 p.m.)

18          ELECTRONIC SOUND RECORDING CERTIFICATION:

19  I, court approved transcriber, certify that the foregoing is a

20  correct transcript from the official electronic sound

21  recording of the proceedings in the above-entitled matter.

22

23  /s/Robin Warbritton                     August 11, 2017
    Signature of Approved Transcriber       Date
24

25  Robin Warbritton
    Typed or Printed Name